HEWITT (CLOUD v.).  See Case No. 2,904.
HEWITT (HINES v.).  See Case No. 6,520.

---

## Case No. 6,443.

HEWITT v. NEW YORK & O. M. R. CO. et al.

STEVENS et al. v. SAME.

[12 Blatchf. 452.] [1]

Circuit Court, S. D. New York.  March 6, 1875.

CONSTITUTIONAL LAW — OBLIGATION OF CONTRACT — VIOLATION — CHARTER — EXEMPTION FROM TAXATION.

1. The cases decided by the supreme court of the United States on the question as to when a state legislature, having granted, by a statute, immunity from taxation, can annul such grant, by repealing the statute, examined and applied.
[Cited in Pennsylvania R. Co. v. Bowers, 124 Pa. St. 192, 16 Atl. 836.]

2. The legislature of New York, by an act passed April 5, 1866 (Laws 1866, c. 398), provided, that the property of the New York and Oswego Midland Railroad Company, a corporation formed under the general railroad law of New York, should be exempt from taxation until a certain event should happen, but for a term of not exceeding ten years. On the 29th of April, 1874, and, as was alleged, before such event had happened, the legislature passed an act (Laws 1874, c. 296) subjecting the property of the corporation to taxation for the future: Held, that the other provisions found in the act of 1866 constituted amendments of the charter of the corporation.

3. The provisions of that act, taken together, including the provision for exemption from taxation, constituted a contract, and one and the same contract.

4. The provision for exemption from taxation could not, as against the corporation and its stockholders, be abrogated by the state, without impairing the obligation of the contract, unless the right so to do was reserved by the state, as a part of the same contract.

5. By reservations in the constitution and statutes of the state, the legislature had the right to amend the charter of the corporation, by repealing such exemption from taxation.
[Cited in Ex parte Chamberlain, 55 Fed. 706.]

[These were bills by Abram S. Hewitt, trustee, against the New York and Oswego Midland Railroad Company and others, and by John G. Stevens and others, trustees, against the same defendants.]

Ashbel Green, for receivers.
John C. Churchill, for tax collector.

BLATCHFORD, District Judge. The New York and Oswego Midland Railroad Company, having been incorporated under the general

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

railroad law of the state of New York, a special act of the legislature of that state was passed on the 5th of April, 1866 (Laws 1866, c. 398), entitled, "An act to facilitate the construction of the New York and Oswego Midland Railroad, and to authorize towns to subscribe to the capital stock thereof," which provides, that commissioners may be appointed for any town or city in certain specified counties, who may borrow, on the faith or credit of such town or city, certain sums of money, on interest, and execute bonds therefor, the bonds to be disposed of, and the money to be raised by any loan or sale of the bonds to be invested in the stock of the said corporation, and to be applied in the construction of the railroad, and in its buildings and appurtenances, and for no other purpose whatever, "the public necessity and utility whereof," says the 3d section of the act, "is hereby declared, and in the construction thereof the said towns and cities are immediately interested." The act further provides, that the commissioners may, for that purpose, in the corporate name of the town or city, subscribe for and purchase the stock of the corporation to the amount designated in the act; that, by virtue of said subscription and purchase, and upon receiving certificates therefor, the town or city shall acquire "all the rights and privileges as other stockholders" of the corporation; that the dividends from the stock so subscribed for or purchased by the town or city shall be applied to pay the interest on the bonds, and that any further amount necessary to pay the principal or interest accruing on the bonds, shall be assessed and levied and collected on the real and personal estate of the town or city as other taxes, and be applied to pay such principal or interest; that the railroad corporation shall have power to receive gifts or grants of land, money or other property, to aid in the construction of the road, and to take by gift or grant, from any person, corporation or town, rights of way; that the proper authority of any town may grant to the corporation the right to use or run upon the roadbed of any public highway in the town; and that the corporation may build two specified branch railroads. In order to the borrowing of any money, or the issuing of any bonds by any town or city, the act makes it a condition precedent, "that the consent shall first be obtained, in writing, of a majority of the tax-payers of such town or city, owning or representing, (as agent, president or otherwise, including owners of non-resident lands), more than one-half of the taxable property of said town or city, assessed and appearing upon the assessment roll of the year eighteen hundred and sixty-five," except that, in the city of Oswego, two-thirds of the voters present and voting at any special or general election therein must signify their assent thereto, and provision is made for a special election in that city. The provisions thus cited

are found in the first 15 sections of the act. The 16th section is in these words: "And it is hereby further provided, that the real and personal property of said corporation shall be exempt from taxation for state, county, town or municipal purposes, until a single track of said road shall be completed and in operation, but the time of such exemption shall not exceed the term of ten years, nor shall this section apply to any road now wholly or partly constructed which may be consolidated with this road." The act then goes on to provide, that the inhabitants and tax-payers of the towns and cities which shall issue the bonds shall have the exclusive right to take and purchase the same for thirty days after they are ready for sale, and shall have the preference over non-residents; and that the corporation may merge its capital stock, franchises and property with those of the Oswego and Syracuse Railroad Company, and of any other railroad corporation organized and operated under the laws of New York, whenever two or more railroads of the corporations so to be consolidated form a continuous line of railroad with each other between the two termini of the New York and Oswego Midland Railroad, or form a portion of a continuous line between said termini. The act then prescribes the method in which such consolidation may be made. It then provides, that no part of the moneys arising from the bonds issued by any town or city shall be expended in any other county than that in which such town or city is situated, until at least $10,000 per mile, on an average, shall have been expended on the grading and construction of each mile of the road lying within such county, but enacts that such provision shall not apply to any county through which the road does not run. The act further provides, that the corporation may acquire the title to such lands and real estate as shall be needed for the purposes of its incorporation, under the provisions of chapter 140 of the Laws of 1850 (which is the general railroad law under which it was incorporated), and the acts amendatory thereof and supplementary thereto, whenever $1,000 per mile of its capital stock shall be, in good faith, subscribed and paid in. Under the general law of 1850, as amended by chapter 53 of the laws of 1853, a railroad corporation could not take proceedings to acquire the title to lands until $10,000 for every mile of its road had been, in good faith, subscribed to its capital stock, and 10 per cent. thereof had been paid in. There is not, in the act of 1866, any reservation of a right to alter, amend or repeal it.

Article 8, § 1, of the constitution of New York, of 1846, is in these words: "Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be at-

tained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time, or repealed." The 1st section of the general railroad act of 1850 (chapter 140) provides, that the corporations formed under it "shall possess the powers and privileges granted to corporations, and be subject to the provisions contained, in title three of chapter eighteen of the first part of the Revised Statutes, except the provisions contained in the seventh section of the said title." The provision of section 8 in said title 3 (1 Rev. St. 600) is as follows: "The charter of every corporation that shall hereafter be granted by the legislature shall be subject to alteration, suspension and repeal, in the discretion of the legislature." The 48th section of the general railroad act of 1850 provides, that "the legislature may, at any time, annul or dissolve any incorporation formed under this act."

On the 29th of April, 1874, an act was passed by the legislature of New York (Laws 1874, c. 296), entitled, "An act to subject the real and personal property of the New York and Oswego Midland Railroad Company to taxation, and to appropriate the amount of the county taxes thereon to certain towns, to be applied towards the payment of the interest or principal on certain town bonds." The 1st section of this act is in these words: "All laws and parts of laws, in so far as they exempt the property, real or personal, of the New York and Oswego Midland Railroad corporation from taxation, are hereby repealed, and the real and personal property of the said corporation is hereby made subject to state, county, town and municipal taxation." The 2d section provides, that "all moneys to be collected upon the real and personal property of the said corporation, and upon said real property now or hereafter used or held, or which may hereafter be used or held, by any receiver or successor of said corporation, for county taxes, in any of the towns or municipalities by which bonds have been issued in aid of the construction of the New York and Oswego Midland Railroad, are hereby appropriated to said towns and municipalities respectively, and shall be paid over to the commissioners of such towns or municipalities appointed pursuant to" the said act of April 5th, 1866, "and the said moneys shall be by said commissioners expended for, and applied to, the payment of the interest on said bonds, or to the principal thereof." The 3d section provides for the payment of such county taxes, when collected "from the said corporation, or the real and personal property thereof," to the said commissioners. It must be inferred, from this legislation, that bonds had been issued by towns, and that the legislature deemed it proper to subject to future taxation the property of the corporation which it had before relieved from taxation, and to appropriate the future county taxes on such property, in each town which had issued such bonds, to the payment of the interest and principal of the bonds issued by such town.

Prior to the passage of the act of 1874, and on the 18th of November, 1873, Abram S. Hewitt and John G. Stevens were appointed, by an order made by this court, in these suits, which are suits to foreclose mortgages on the property of said corporation, receivers of such property, with authority to operate the railroad of said corporation and railroads held by it under lease. The receivers now present to this court a petition, setting forth that said corporation has been assessed on the tax rolls of the city of Oswego, in this state, on property which belonged to said corporation before such receivers were appointed; that a warrant has been issued to the collector of the city of Oswego, to collect a tax of $3,453 27 thereon; that such tax has not been paid; that such collector has levied on some passenger coaches in the possession of the receivers, worth $16,000, and which belonged to said corporation before the receivers were appointed, to meet the tax, and has advertised them for sale; and that such property was levied upon as the property of said corporation, and was placed in the hands of said receivers under said order of this court. The petition then sets forth the passage and contents of the said act of 1866 and of the said act of 1867, and alleges, that the corporation was organized to construct, maintain and operate a railroad from Oswego to the state line of New Jersey, and thence to a point on the Hudson river opposite the city of New York; and that a single track of said railroad has not been completed as provided in the act of 1866. The petition prays for an injunction perpetually restraining the said collector from levying upon or selling any of the property placed in the hands of the receivers by this court, and for a temporary injunction until a decision upon the petition, restraining the said collector from further proceeding under such levy. Such temporary injunction was granted.

On the hearing on the petition, it is contended, for the receivers, that the act of 1874 is unconstitutional and void, as being an act impairing the obligation of a contract made by the enactment of the act of 1866, and, therefore, repugnant to section 10 of article 1 of the constitution of the United States, which provides, that no state shall pass any law impairing the obligation of contracts. It is urged, that it is settled, by a series of decisions made by the supreme court of the United States, that a state can waive its right to tax property, for any length of time it may designate; that such waiver, when contained in any act of a state legislature, whether an act under which a corporation comes into existence, or an act of a different character, is a contract between the state and the party in whose favor the waiver is made; that any subsequent legislation repealing or annulling such

waiver contravenes the said provision of the constitution; that benefit to the public is a sufficient consideration to support such a contract; and that the existence of the consideration, having been determined by the legislature, will not be inquired into by a court. It is further contended, for the receivers, that, as the act of 1866, which grants the exemption in this case, does not reserve to the legislature any right to amend or repeal it, and as the provision of section 1 of article 8 of the constitution of New York is only to the effect that general laws and special acts passed pursuant to that section, to form or create corporations, may be altered or repealed, and as section 8 of title 3 of the Revised Statutes only provides that the charter of a corporation may be altered or repealed, and as the act of 1866 is not a charter, or an act creating or forming the corporation, or an amendment of any charter, or of any act creating or forming the corporation, therefore, there is not, in the constitution of New York, or in any statute in force when the act of 1866 was passed, or in that act itself, any reservation of any right to repeal or annul the contract created by the enactment of the 16th section of that act.

For the tax collector, it is contended, that the legislature could lawfully repeal the 16th section of the act of 1866. It is conceded, by his counsel, that, if the exemption contained in that section had formed a part of the general railroad law under which the corporation was formed, or of any special act of incorporation, there would have been a contract between the state and the corporation, which could not have been repealed, unless the right of repeal had been reserved in the constitution, or in some prior statute, or in the general law or special act; but, he maintains, that the exemption in the act of 1866 was a gratuitous, executory promise on the part of the state, contained in an act which imposed no obligation on the corporation, and did not vest or secure any rights of property, and did not have the elements of a contract; and that, if the act of 1866 was a part of the charter of the corporation, the provisions cited from the constitution and statutes of New York constituted a reservation of the right to amend the charter, and, therefore, to repeal the exemption.

The first case, involving the question of the effect of an act of a state legislature repealing a provision in a prior act, as impairing the obligation of a contract, that was decided by the supreme court of the United States, was that of New Jersey v. Wilson, 7 Cranch [11 U. S.] 164, in 1812. Prior to 1758, the Delaware Indians had claims to certain lands in New Jersey. It became an object for the government of New Jersey to extinguish those claims. In 1758, a convention was agreed upon between the Indians and that government, whereby the government was to purchase a tract of land for the residence of the Indians, in consideration of their releasing their claim to certain specified lands. To carry this convention into effect, an act was passed, in 1758, by the legislature of New Jersey, authorizing the purchase of lands for the Indians, restraining them from selling or leasing the same, and enacting, "that the lands to be purchased for the Indians aforesaid shall not hereafter be subject to any tax." In virtue of this act, the convention was carried into execution, lands were purchased and conveyed to trustees for the use of the Indians, and they released their claim to the lands specified in the convention. In 1801, the legislature of New Jersey passed an act authorizing the sale of the lands so purchased. That act made no reference to the privilege of exemption from taxation, conferred by the act of 1758. The lands were sold. In 1804, the legislature of New Jersey passed an act repealing the exemption provision in the act of 1758. The lands were then assessed for taxes, and the purchasers took the ground that the repealing act impaired the obligation of a contract and was void. The state courts of New Jersey affirmed the validity of the repealing act, but the judgment was reversed by the supreme court of the United States. That court held, that the provision of the constitution extended to contracts to which a state was a party, as well as to contracts between individuals. Upon the question whether, in the case before it, a contract existed, and whether such contract was violated by the repealing act, it held, that every requisite to the formation of a contract was found in the proceedings of 1758 between the government of New Jersey and the Indians; that, in consideration that the Indians would extinguish their claims to certain specified lands, the government agreed to purchase another tract of land for them and exempt it from taxation; that, in consideration of this arrangement, of which the act exempting such land from taxation was a part, the Indians ceded their claims to the other lands; that this was a contract; that the privilege of exemption from taxation was annexed, by the act, to the land, and not to the persons of the Indians, it being for the advantage of the Indians that it should be annexed to the land, because, in the event of a sale, when alone the question would be material, the value of the land would be enhanced by the privilege; that the state of New Jersey had not, as it might have done, insisted on a surrender of such privilege, as a condition of allowing a sale of the land, but had assented to such sale, with all the privileges attached to the land, and the purchasers had succeeded, with the assent of the state, to all the rights of the Indians, and stood, with respect to the land, in their place, claiming the benefit of the contract; and that the contract was impaired by the repealing act annulling the privilege. Three points are decided by the case of New Jersey v. Wilson [supra]—(1) that a state may

contract to exempt property from future taxation, in such manner as to make such contract irrevocable without the consent of the person claiming the exemption; (2) that, to make such contract thus irrevocable, it must have the elements of a contract; (3) that one of such elements is, a consideration for the agreement on the part of the state.

The decision in Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 518, in 1819, established the principle, that a charter granted by the British crown to the trustees of a college, was a contract, within the meaning of the clause of the constitution which declares that no state shall pass any law impairing the obligation of contracts, and that a law of a state, altering the charter, without the consent of the corporation, in a material respect, was an act impairing the obligation of the contract and void. The alteration of the charter in that case was, the transfer of the governing power of the corporation from trustees appointed according to the will of the founder, expressed in the charter, to the executive of the state. The court held, that the charter was a contract, incorporating the trustees of the college, with the usual corporate powers, authorizing them to fill their own vacancies, and to administer the property of the corporation; that the objects for which the corporation was created were beneficial to the country; that this benefit constituted the consideration of the grant; that the donors of money to the college, in return for giving the money, stipulated for the consideration that the moneys should be perpetually applied to the object set forth, in the mode prescribed by themselves; that there were three parties to the contract, the donors, the trustees, and the crown; and that the contract was one for the security and disposition of property, and was made on a valuable consideration, and was one on the faith of which property had been conveyed to the corporation.

In Providence Bank v. Billings, 4 Pet. [29 U. S.] 514, in 1830, it was held, that where a charter of a bank gave it no express exemption from taxation, a general law of the state, taxing it in common with other banks, did not impair the obligation of any contract contained in its charter. The court, while holding that a contract entered into between a state and an individual is as fully protected by section 10 of article 1 of the constitution as a contract between two individuals, and that a charter incorporating a bank is a contract, upheld the validity of the law taxing the bank.

In Charles River Bridge v. Warren Bridge, 11 Pet. [36 U. S.] 420, in 1837, it was held, that a state law may be retrospective and divest vested rights, and yet not violate the constitution of the United States; that, where the charter of a bridge corporation did not contain any express contract that the state would not authorize another bridge to be built to the injury of the corporation, such contract would not be implied; and that a law empowering another corporation to erect and maintain a free bridge, so near to the first as practically to deprive the first corporation of all tolls, was not a law impairing the obligation of any contract.

In Gordon v. Appeal Tax Court, 3 How. [44 U. S.] 133, in 1844, it was held, that where the legislature of a state, by statute, accepted from banking corporations a bonus, as a consideration for granting the corporate franchise, and therein pledged the faith of the state "not to impose any further tax or burden upon them, during the continuance of their charters under this act," a tax upon the stockholders by reason of their stock was a violation of the contract, and the tax was illegal.

In State Bank of Ohio v. Knoop, 16 How. [57 U. S.] 369, in 1853, it was held, that the legislature of a state, if not restrained by its constitution, may make a valid and binding contract with a corporation, in its charter, that no more than a specified amount of taxes shall be levied on its property during a term of years, and that a succeeding legislature has not power to pass a law impairing the obligation of such contract. In that case, the act of incorporation provided that a specified sum of money, if paid by the corporation, should be in lieu of all taxes to which the corporation would otherwise be subject. The court say: "Every valuable privilege given by the charter, and which conduced to an acceptance of it, and an organization under it, is a contract which cannot be changed by the legislature, where the power to do so is not reserved in the charter. The rate of discount, the duration of the charter, the specific tax agreed to be paid, and other provisions essentially connected with the franchise, and necessary to the business of the bank. cannot, without its consent, become a subject for legislative action." It was held, that the state had, in the act of incorporation, proffered certain privileges, which had been accepted by the stockholders, such as the franchise, the rate of interest to be charged, the duration of the charter, the liabilities of the corporation, the rate of taxation, and other privileges, and that, in consideration thereof, funds had been invested in the bank; that this constituted a contract between the state and the corporation—a contract founded on considerations of policy required by the general interests of the community; and that the state could not annul such contract. It was further said by the court, in that case, that, where a consideration appears to have existed for the agreement on the part of the state, the court will not inquire into its sufficiency, but will regard the agreement as a contract, which a subsequent legislature cannot impair; that a state, in granting privileges to a corporation, with a view of advancing any policy connected with the public interest, exercises its sovereignty, and for a public purpose, of

which it is the exclusive judge; that a contract for a specific tax, and for exemption from other taxes, is binding, and is an exercise of the sovereignty of the state; and that, if such contract is impaired by an act of the state, such act is void. The conclusion of the court was, that, as regarded the rights of the corporation under the charter, the acceptance of the charter, on its terms, and the payment of the capital stock, under an agreement to pay a sum specified in the charter, in lieu of all taxes, constituted a contract binding on the state and on the corporation, and that a subsequent statute, assessing a higher tax on the corporation than was stipulated in the charter, impaired the obligation of the contract, and was prohibited by the constitution of the United States, and was, as regarded the tax thus imposed, void.

These views were affirmed by the same court, in 1855, in Dodge v. Woolsey, 18 How. [59 U. S.] 331.

In 1860, the case of Christ Church v. County of Philadelphia, 24 How. [65 U. S.] 300, was decided. The legislature of Pennsylvania, in 1833, passed an act, which recited, "that Christ Church Hospital, in the city of Philadelphia, had, for many years, afforded an asylum to many poor and distressed widows, who would probably else have become a public charge, and, it being represented that, in consequence of the decay of the buildings of the hospital estate, and the increasing burden of taxes, its means are curtailed, and its usefulness limited," and then enacted, "that the real property, including ground rents, now belonging and payable to Christ Church Hospital, in the city of Philadelphia, so long as the same shall continue to belong to the said hospital, shall be and remain free from taxes." In 1851, the legislature passed an act providing, "that all property, real and personal, belonging to any association or incorporation, which is now by law exempt from taxation, other than that which is in the actual use and occupation of such association or incorporated company, and from which an income or revenue is derived by the owners thereof, shall hereafter be subject to taxation, in the same manner and for the same purposes as other property is now by law taxable, and so much of any law as is hereby altered and supplied be and the same is hereby repealed." The supreme court of Pennsylvania decided that the exemption conferred by the act of 1833 was partially repealed by the act of 1851, and that an assessment of a portion of the real property of the hospital, under the act of 1851, was not void, as tending to impair any contract contained in the act of 1833. The case was taken, by writ of error, to the supreme court of the United States, and it was there contended, that the exemption conceded by the act of 1833 was perpetual, and that that act was itself, in effect, a contract. But the court held, that the concession of the legisla-

ture was spontaneous; that no service or duty or other remunerative condition was imposed on the corporation; that the privilege conferred existed bene placitum, and might be revoked at the pleasure of the sovereign; and that there was no contract.

In Jefferson Branch Bank v. Skelly, 1 Black, [66 U. S.] 436, in 1861, the supreme court affirmed the principle laid down in the cases before referred to, that a state legislature, unless prohibited in terms by a state constitution, may contract, by legislation, to release the exercise of taxing a particular thing, corporation, or other person; and that, where such a contract is made, by the passage of an act of the legislature, an act passed by a subsequent legislature, repealing the former act and imposing the tax, is a violation of the contract, and repugnant to the constitution of the United States.

In The Binghamton Bridge, 3 Wall. [70 U. S.] 51, in 1865, the court held, that the legislature of New York had, by an act incorporating a bridge company, contracted with it, that if it would build and maintain a safe and suitable bridge across a specified river, at a specified place, for the accommodation of the public, it should have, in consideration therefor, a perpetual charter, and the right to take certain specified tolls, and that it should not be lawful for any person or persons to erect any bridge, or establish any ferry, within a distance of two miles, on such river, either above or below such bridge; and that an act of a subsequent legislature, chartering another corporation, with power to construct a bridge for general road travel over the same river, and within the prohibited distance, was in violation of the contract made by the first act, and void.

In Home of the Friendless v. Rouse, 8 Wall. [75 U. S.] 430, in 1869, the state of Missouri had, in 1853, incorporated an institution by a special act, which stated, in its preamble, that it was passed for the purpose of encouraging the establishment of a charitable institution, to afford relief to destitute and suffering females, and enabling the parties engaged therein more fully and effectually to accomplish their laudable purpose, and enacted, that all property of the corporation "shall be exempt from taxation," and that an already existing provision of statute, declaring that every charter of incorporation should be subject to alteration, suspension, or repeal, at the discretion of the legislature, should not apply to such corporation. The corporation was organized and had acquired a considerable amount of real estate. Under the authority of a constitution adopted by Missouri, in 1865, the legislature imposed a tax on the real property of the corporation. The state court upheld the validity of the tax, and the supreme court, on a writ of error, held, that the exemption from taxation was held out by the legislature as an inducement to the making of donations of money and land to the corporation; that the charter

was a contract between the state and the corporators, that the property given for the charitable uses specified in it, should, so long as it was applied to such uses, be exempted from taxation; that there is no necessity for looking for the consideration of a legislative contract, outside of the objects for which the corporation was created; that such objects were deemed by the legislature to be beneficial to the community, and such benefit constituted the consideration for the contract, and no other was required to support it; that a state may, by contract, based on a consideration, exempt the property of an individual or a corporation from taxation, either for a specified period or permanently; that the exemption is presumed to be on sufficient consideration, and binds the state, if the charter containing it is accepted; that the state of Missouri did make a contract, on sufficient consideration, with the corporation, to exempt its property from taxation; and that the attempt to compel it to pay taxes was an indirect mode of impairing the obligation of the contract.

In Washington University v. Rouse, 8 Wall. [75 U. S.] 439, in 1869, the same views were held in regard to a university for learning.

In Wilmington Railroad v. Reid, 13 Wall. [80 U. S.] 264, in 1871, the legislature of North Carolina had, in 1853, chartered a railroad corporation. One section of the act of incorporation provided, that "the property of said company and the shares therein shall be exempt from any public charge or tax whatsoever." While this act was in force, the franchise, and the rolling stock, and certain real estate of the corporation, were assessed, under a subsequent law, for taxation, by the state and a county in it. The state court held, that the subsequent law did not impair the obligation of a contract, and that the tax was valid. The supreme court held, that the legislature had, in the charter, told the corporation, that, if it would complete its road, its property and the shares of its stockholders should be forever exempt from taxation; that all the real and personal estate required by it for the successful prosecution of its business was exempted from taxation; that the franchise of the corporation was part of its property; and that the subsequent act of the legislature impaired the obligation of the contract made in the charter, and was void.

In Tomlinson v. Jessup, 15 Wall. [82 U. S.] 454, in 1872, the state of South Carolina had, in 1851, incorporated a company, for 50 years, to build a railroad. At the time the charter was passed, there was in force a statute of the state, passed in 1841, declaring that the charter of every corporation subsequently granted, and any renewal, amendment or modification thereof, should be subject to amendment, alteration or repeal, by legislative authority, unless the act granting the charter, or the renewal, amendment or modification, should, in express terms, except

it from the operation of that law. In 1855, an act was passed, "to amend the charter" of the corporation, "and for other purposes," which provided, that its stock, and the real estate it then owned or might thereafter acquire, connected with or subservient to the works authorized by its charter, should be exempted from all taxation during the continuance of its charter. This act did not except itself or the original charter from the operation of the act of 1841. Under acts passed in 1868, and subsequently, whereby the property of corporations was made liable to taxation, proceedings were taken to assess and tax the property of this corporation. The supreme court held, that the provisions of the law of 1841 constituted the condition upon which the charter granted in 1851 was held, and upon which every amendment or modification of it was made; that the power reserved to the state by the law of 1841 authorized any change in the contract, as it originally existed, or as subsequently modified, or its entire revocation; that the stockholders took their interests with knowledge of the existence of this power, and of the possibility of its exercise at any time, in the discretion of the legislature; that the right of a legislature to surrender its power of taxation, so as to bind its successors or the state, is upheld, when and because the exemption is made on considerations moving to the state, which give to the transaction the character of a contract, which is thus brought within the protection of the federal constitution; that, in the case of a corporation, if the exemption is made in the original act of incorporation, it is supported upon the consideration of the duties and liabilities which the corporators assume by accepting the charter, and, if it is made by an amendment of the charter, it is supported upon the consideration of the greater efficiency with which the corporation will thus be enabled to discharge the duties originally assumed by the corporators to the public, or of the greater facility with which it will support its liabilities and carry out the purposes of its creation; that, by the reservation of power in the act of 1841, immunity from taxation, as a part of the contract with the state, was subject to be revoked equally with any other provision of the charter, whenever the legislature might think it expedient to make the revocation; and that the reservation affected the entire relation between the state and the corporation, and placed under legislative control all rights, privileges and immunities derived by its charter directly from the state.

In Miller v. State, 15 Wall. [82 U. S.] 478, in 1872, the court construed the provisions before cited from the constitution of New York, of 1846 (article 8, § 1), and from the 1st and 48th sections of the general railroad law of New York, of 1850 (chapter 140), and from section 8 of title 3 of chapter 18 of the first part of the Revised Statutes of New York (1 Rev. St. 600), in regard to the right

of the legislature to alter or amend the charter of a corporation. A railroad corporation had been formed under the general railroad law of 1850, with thirteen directors and a capital stock of $800,000. The legislature, by an act passed in 1851, authorized the city of Rochester to subscribe for three-eighths of the stock, or $300,000, and provided, that, if the subscription were accepted, the city should appoint one director for every $75,000 subscribed by it, that is, four directors of the thirteen. This left nine directors to be appointed by the stockholders of the remaining $500,000 of stock. The city subscribed and paid its $300,000. The other stockholders paid only $255,200 of their subscriptions. In 1867, the legislature passed an act which gave to the city the power to appoint one director for every $42,855.57 owned by it, thus substantially apportioning the number of directors according to the stock actually paid for. This gave to the city seven directors of the thirteen, and to the other stockholders six. The question arose, whether there was a contract made by the state in respect to the number of directors, and whether the act of 1867 violated that contract. It was contended, that the act of 1867 was void, as being repugnant to the act of incorporation. The court held, that there was, in the constitution and prior statutes, a reservation of a right to alter the act of incorporation, under which the act of 1867, if an alteration of the charter, was valid: that the right to elect nine of the thirteen directors was not a vested right, and the act of 1867 did not impair any vested right, because the concession made in the special act of 1857 was subject to the reserved power to alter or repeal the charter, and left the legislature the power to change the apportionment of directors; and that the act of 1867 was valid.

In Holyoke Co. v. Lyman, 15 Wall. [82 U. S.] 500, in 1872, the same views were applied as in the case last cited. The General Laws of Massachusetts provided, that every act of incorporation passed after 1831 should "at all times be subject to amendment, alteration or repeal at the pleasure of the legislature." A corporation was chartered in 1848, to construct a dam across a river, to make a water-power. The act of incorporation required it to pay damages to the owners of fishing rights above. It constructed its dam without a fishway, and paid such damages. The act did not expressly exempt it from maintaining the dam without a fishway. Afterwards, the legislature passed an act requiring a corporation which was its successor in the ownership of the franchise, to construct a fishway in the dam. It was contended, that the last act impaired the obligation of the contract contained in the charter, and was void. But the court held, that the charter was subject to the implied condition, that a suitable fishway should be constructed in the dam, and that, as it contained no stipulation exempting the corporation from such implied condition, it was subject to the power of amendment reserved by the general statute, and no contract was impaired nor any vested right infringed, and neither the object of the charter, nor any rights vested under it, were defeated or substantially impaired, and the act requiring the fishway to be constructed in the dam was valid.

In Humphrey v. Pegues, 16 Wall. [83 U. S.] 244, in 1872, the legislature of South Carolina had, in 1849, incorporated railroad company number one, granting to it the privileges granted by the charter of a prior company. These privileges did not include any exemption of its property from taxation. In 1851, the legislature incorporated railroad company number two, by an act which contained no exemption of its property from taxation. In 1855, it passed an act "to amend the charter" of company number two, "and for other purposes," which provided, that the stock of company number two and its real estate, then owned or to be acquired, connected with or subservient to its works, should be exempted from all taxation during the continuance of its charter, which would expire in 1901. In 1863, the legislature amended the act incorporating company number one, by declaring that all the privileges granted "by the charter" of company number two were thereby granted to company number one. The road of company number one had not then been built. It was afterwards built. Thereafter, officers acting under the authority of the legislature imposed taxes on the stock and property of company number one. The question arose, whether the act of 1855 formed part of the charter of company number two, when, in 1863, the privileges granted to that company were conferred on company number one, or whether such privileges were limited to those granted to company number two by the original act of 1851. It was contended, for the state, that, as the act of 1855 was an act to "amend the charter" of company number two, it followed, that the act of 1851 was "the charter" of company number two, and that, when the act of 1863 gave to company number one all the privileges granted by "the charter" of company number two, it gave only those granted by the act of 1851, and did not give the exemption from taxation contained in the act of 1855. The court held, that the charter of company number two, as it existed in 1863, was based upon the two acts of 1851 and 1855; that, after the passage of the act of 1855, company number two stood, in law, as if it had been originally chartered with the privileges conferred upon it by the act of 1855; that all those privileges were conferred upon company number one by the act of 1863; that it appeared that, prior to 1863, no sufficient inducements had been found to procure the building of the road of that company, and the exemption from taxation conferred by the act of 1863 was of great value, and the road was after-

wards built; and that there was, in that instance, the consideration that at any time exists for the granting, by the legislature, of the privilege of exemption from taxation, to aid the acceptance of the same and the building of the road. The court further say: "Another question is raised, to wit, that a legislature does not possess the power to grant to a corporation a perpetual immunity from taxation. It is said, that the power of taxation is among the highest powers of a sovereign state; that its exercise is a political necessity, without which the state must cease to exist, and that it is not competent for one legislature, by binding its successors, to compass the death of the state. It is too late to raise this question in this court. It has been held, that the legislature has the power to bind the state, in relinquishing its power to tax a corporation. It has been held, that such a provision, in the charter of an incorporation, constitutes a contract, which the state may not subsequently impair." Some of the cases above quoted are then cited, and the court say, that these doctrines "must be considered as settled in this court."

The most recent case on the subject, decided by the supreme court of the United States, to which my attention has been called, is that of Pacific R. Co. v. Maguire, 20 Wall. [87 U. S.] 36. The Pacific Railroad Company was incorporated by the state of Missouri, by special act, in 1849. Authority was therein given to the counties through which it should pass, to subscribe for the stock. By an act passed in 1851, provision was made for loaning the bonds of the state to the corporation. By an act passed in 1852, certain public lands were vested in the corporation, and it was authorized to build a southwestern branch road, and provision was made for the issuing of more bonds of the state, to be used in aid of the work, and that the road should be completed and put in operation within five years from the passage of that act. The act then provided (section 12) that the road and the southwestern branch road should be exempt from taxation respectively, until the same should be completed, opened and in operation, and should declare a dividend, and that then the property of the road, at its cash value, should be subject to taxation at the rate assessed by the state on other property of like value, with the proviso, that, if the corporation should fail, for the period of two years after the said roads respectively should be completed and put into operation, to declare a dividend, then it should no longer be exempt from the payment of said tax. This act and its grants were accepted in the manner thereby prescribed. The road was completed and put in operation on the 1st of April, 1866, but, before any dividend had been declared or paid, and before the two years had elapsed, a tax was levied on the property of the cor-

poration, under a "railroad ordinance," adopted on the 4th of July, 1865, as a part of the constitution of Missouri. This ordinance provided, that there should be levied and collected from this road, and from two other specified roads, an annual tax of 10 per centum of all their gross receipts for the transportation of freight and passengers, (not including amounts received from, and taxes paid to, the United States,) from the 1st of October, 1866, to the 1st of October, 1868, and 15 per centum thereafter, which tax should be assessed and collected as other taxes, and be appropriated to paying the principal and interest of the bonds of the state and the bonds guaranteed by the state, issued to the three companies, provided, that the tax should be collected from each company only for the payment of the principal and interest on the bonds for the payment of which such company should be liable. The penalty imposed for the non-payment of the tax was the sale of the property and franchises of the company. The tax assessed was 10 per cent. on the gross earnings of the company for the year commencing October 1st, 1866, and was assessed in the same manner as other state taxes. The state court held that the tax was lawful. This decision was reversed by the supreme court, which held, that the 12th section of the act of 1852 created a contract between the state and the company, by which the road was exempt from taxation until it was completed and put in operation, and until it should declare a dividend on its capital stock, not, however, extending longer than two years after its completion; and that the ordinance of 1865, imposing a tax of 10 per cent. upon the gross earnings, before the road was completed and in operation and had declared a dividend, was a violation of the contract, and the levy for its enforcement was illegal. The court affirmed the doctrine, that, when a contract of exemption from taxation is established, it is binding upon the state, and the action of the state in passing a law violating the terms of the contract will not be sustained. It also holds, that, in the case before it, there was such a contract; that the corporation was unable to raise funds for completing its road; that, to induce it to go on with its work, and to induce individuals and counties to subscribe for stock in what the legislature evidently deemed an enterprise of public benefit, loans of the credit of the state were made from time to time; that, to make the franchise still more valuable to the corporation, and to the end that individuals and counties should be induced to subscribe to the stock, the legislature added an exemption from taxation until the road should be completed and in operation and should have declared a dividend; that the money value of this exemption was shown to have been large, by the amount of the tax in question; and that the transaction amounted to a contract between the state and the

corporation, that there should be no taxation of the company until the occurrence of the stipulated events.

In the case now before the court, it is manifest, from the terms of the act of 1866, that the work of the construction of the road of the New York and Oswego Midland Corporation required facilitation, and that such facilitation, by authorizing towns and cities which would be benefited by its construction to subscribe for its stock, and expend their money in constructing the road, was deemed necessary by the legislature. The title of the act is, "An act to facilitate the construction" of the road "and to authorize towns to subscribe to the capital stock thereof." A prominent facilitation to the construction of the road, given in the act, is the provision for investing the money of the towns and cities in the stock of the company, and for expending such money in building the road, coupled with the exemption of the property of the company from taxation. The bonds to be issued might, by the terms of the act, amount, in a town, to 30 per cent. of the assessed valuation of its property, for the year 1865, and, in a city, to 15 per cent. The money raised by the sale of the bonds was directed to be invested in the stock of the corporation, and to be used by it in constructing the road and its buildings and appurtenances, and for no other purpose, and the act declared "the public necessity and utility" of the road, and also declared, that the towns and cities authorized to issue such bonds were "immediately interested" in the construction of the road. The towns and cities thus becoming stockholders were to acquire, as such, thereby, the same rights and privileges as other stockholders. The dividends on the stock were to be applied to pay the principal and interest of the bonds, and the deficiency was to be raised by taxation on the real and personal estate of the town or city. The act also provides, that the corporation may take from towns gifts or grants of rights of way, and of rights to use or run on the road-beds of public highways. It also empowers the corporation to build two branch railroads, one to Newburgh and one to Ellenville, and declares, that the proceedings theretofore taken in organizing the corporation, and in filing its articles of association, shall be deemed legal and valid, as well for the purposes of its organization as for constructing such branch roads, and enacts, that, in constructing said branch roads, it shall have all the powers, and be subject to the liabilities, provided in the general railroad law. The act also confers upon the corporation the faculty of consolidating itself with other corporations, so as to form a continuous line of road between its two termini, and to create a new consolidated corporation, with certain rights, franchises and property. There is, also, the provision, before referred to, giving the corporation the power to acquire title to land by compulsory proceedings

under the general railroad law, on having $1,000 per mile of stock subscribed and paid in, instead of its being restricted from doing so unless $10,000 per mile should be subscribed and $1,000 thereof be paid in. Interwoven with these provisions is the one for exemption from taxation, contained in section 16 of the act. This exemption was a valuable privilege. It was given in an act which authorized towns and cities to issue bonds, and subscribe for stock in the road, and thus facilitate its construction. But for this provision, the towns and cities would have had no power to issue the bonds or take the stock. By the general railroad law, and, therefore, by the charter of this corporation under it, towns and cities could not be holders of stock in it. By the act of 1866, they could become such stockholders, provided the expressed assent of tax-payers in towns and cities other than the city of Oswego, and the suffrage of electors in that city, were first given in favor of the measure. As an inducement to giving such assent and such votes, the exemption from taxation was granted. The subscription for stock is directed to be made in the corporate name of the town or city. The commissioners whom the act authorizes to be appointed are empowered by it to act for and represent the town or city, as a stockholder, at all meetings of stockholders. These functions conferred by the act of 1866 upon towns and cities, as stockholders in this particular corporation, and upon their agents, are amendments of the charter of this particular corporation. So, also, the power given to it by that act to build the two branch railroads, and the extension, by that act, of the scope and operation of its articles of association, so as to cover the construction of such branch roads, and the powers given to it, by that act, to consolidate with certain other specified railroad corporations, and to acquire the title to real estate, by compulsory proceedings, on more favorable terms than under the general law, are amendments of the charter of the corporation. The corporation must be regarded as having accepted these amendatory provisions, in conjunction with the provision for exemption from taxation. All, taken together, constituted a contract, and one and the same contract. All were provisions essentially connected with the franchise of the corporation. The contract was founded on considerations of policy, stated in the act, and of which the legislature had the sole right to judge. The act declares, that the construction of the road is a matter of public necessity and utility, that the towns and cities specified are immediately interested in its construction, and that the measures provided, and which are in amendment of the charter, for enabling such towns and cities to issue bonds and take stock in the corporation, are measures in facilitation of the construction of the road. The exemption from taxation given by the act amending

the charter is supported upon the consideration of the greater efficiency with which the corporation will be enabled to discharge the duties originally assumed by its corporators to the public, not only in view of its status without having for its stockholders any towns or cities, but, also, in view of the fact that, because of the exemption from taxation, towns and cities will issue bonds and become stockholders, and thus the corporation will have greater efficiency and greater facility to carry out the purposes of its creation. The charter of the corporation stood, after the passage of the act of 1866, as if the corporation had been originally chartered with all the additional faculties conferred by the act of 1866. The present case resembles very much, in its main features, that of Pacific R. Co. v. Maguire, above cited. There, the original charter gave authority to counties to subscribe for the stock. A subsequent act provided for loaning the bonds of the state to the corporation, and vested public lands in the corporation, and authorized it to build a branch road. This latter act exempted the road from taxation for a limited period. The exemption was held to be a stipulation in a contract, whereby, in order to induce subscriptions to stock in what was regarded as an enterprise of public benefit, the state loaned its credit to the corporation and granted to it an exemption from taxation for a limited time. There can be no doubt, I think, that, in the present case, the stipulation for exemption from taxation was a stipulation contained in an act amending the charter of the corporation, and was a stipulation forming part of a contract between the state and the corporation, and was one which, as against the corporation and its stockholders, could not be abrogated by the state, without impairing the obligation of the contract, unless the right so to do was reserved by the state, as a part of the same contract.

The act of 1874, repealing all laws exempting the property of the corporation from taxation, has no retrospective operation. It does not purport, or have the effect, to subject the property of the corporation to taxation for any period anterior to the passage of the act of 1874. On the contrary, the 1st section of that act, after the repealing clause, goes on to say: "and the real and personal property of the said corporation is hereby made subject to state, county, town and municipal taxation," that is, to future taxation, for and in respect of future time, not to future taxation for past time, or to past taxation for past time. So far as the act of 1874, either by repealing a prior exemption from taxation, or by affirmative provision subjecting property to taxation, undertakes to subject the property of this corporation to taxation, it subjects it to no greater or other future burdens than like property in a like situation. It is a mere exercise of the general taxing power of the state. It does not destroy any vested right, or deprive the corporation or its stockholders of any property or right of property vested in them, or divert their property to any purpose inconsistent with the purpose of the charter. It leaves the exemption enacted by the act of 1866 in force for the period between the passage of that act and the passage of the act of 1874. No complaint can be made that the act of 1874 does not exercise fairly the power of taxation, nor that the provision for employing the moneys collected for county taxes in a town or city which has issued bonds in aid of the construction of the road, to pay the interest and principal of such bonds, is not a proper and competent disposition of such moneys. In view of the decisions above referred to, the reservation in the constitution of the state, and in the general railroad law, and in the Revised Statutes, gave to the legislature the right to amend the charter of this corporation, by repealing the exemption from taxation, and enacting the provisions for taxation which are found in the act of 1874. The provisions of law in force when this corporation was organized, authorizing the legislature to amend or alter the charter of any corporation thereafter to be created, constituted a condition upon which this corporation was formed, and upon which it held its franchise, and upon which every amendment of its charter was made. The power reserved to the state authorized the change made by the act of 1874 in the contract for exemption from taxation. The individuals who, and the towns and cities which, became stockholders while the 16th section of the act of 1866 was in force, took their interests with knowledge of the existence of such power, and of the possibility of its exercise at any time, in the discretion of the legislature. Immunity from taxation, as a part of the contract, was subject to be revoked by the state, at any time, in the discretion of the legislature, because the reservation placed under legislative control all immunities derived from the state by the charter, or by any amendment thereto.

It was stated, on the argument, that, if the act of 1874 were held to be valid, questions remained to be discussed as to the mode in which the tax in question was assessed, as having been assessed against the corporation and its property, and not against the receivers, and other questions in regard to the levy of the tax. I will hear the parties in regard to those questions, if desired.

[NOTE. Subsequently, upon foreclosure proceedings being brought against certain property owned by the New York and Oswego Midland Railroad Company, receivers were appointed. These receivers applied for injunctions to restrain the tax collectors of certain towns from proceeding to interfere with said property by selling it under warrants to satisfy certain state taxes. The applications were denied. Case No. 13,405. In Case No. 13,406, the court made an order of distribution of the proceeds of the mortgaged railroad and its property.